UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | CRIMINAL NO. 13-CR- 227 |
| : | |
| v. : | VIOLATIONS: |
| : | |
| : | 18 U.S.C. § 1001 |
| : | (Making a False Statement) |
| VERNON HAWKINS, : | |
| Defendant. : | |

STATEMENT OF THE OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant VERNON HAWKINS and the United States agree and stipulate that at all relevant times:

Individuals and Entities

1. Beginning in the spring of 2010, and continuing through the 2010 general election, CANDIDATE A, a resident of the District of Columbia, was a candidate for Mayor of the District of Columbia.

2. Beginning in the spring of 2010, and continuing through the 2010 general election, defendant VERNON HAWKINS ("HAWKINS"), a resident of the District of Columbia, was a volunteer advisor for the CANDIDATE A for Mayor campaign (hereinafter, "CAMPAIGN A"). HAWKINS provided advice to the candidate and other members of the campaign on matters such as field operations, staffing, and communications. HAWKINS previously had served as a paid consultant and community outreach worker for CANDIDATE A's 2004 campaign for Ward 7 Council Member and as a volunteer advisor for CANDIDATE A's 2006 campaign for Chairman of the Council of the District of Columbia ("D.C. Council").

3. EXECUTIVE A, a resident of the District of Columbia, was a named partner, Chairman and Chief Executive Officer, and the majority owner of COMPANY A. EXECUTIVE A worked at COMPANY A's main office in the District of Columbia.

4. EUGENIA C. HARRIS ("HARRIS"), a resident of the District of Columbia, owned and controlled two for-profit corporations registered in the District of Columbia: Belle International, Inc. ("BELLE") and Details International, Inc. ("DETAILS").

5. Beginning in the summer of 2010, and continuing through the 2010 primary election, PERSON TWO, a resident of Pennsylvania, was the field coordinator for an effort, which was funded by EXECUTIVE A, to Get Out The Vote ("GOTV") in support of CAMPAIGN A.

6. Beginning in the summer of 2010, and continuing through the 2010 primary election, PERSON ONE, a resident of the District of Columbia and the owner of a catering business in the District of Columbia, was the transportation coordinator for the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A.

7. The Federal Bureau of Investigation ("FBI") was an agency within the executive branch of the federal government, headquartered in Washington, D.C. Among the FBI's top investigative priorities was public corruption, including election crimes and local corruption.

**Involvement in Third-Party Campaign Expenditures in Support of CAMPAIGN A**

8. During the 2010 District of Columbia Mayoral campaign, EXECUTIVE A, with assistance from HAWKINS, HARRIS, and others, funded an effort to support CAMPAIGN A by providing services and materials to assist in GOTV activities for CANDIDATE A. HARRIS

2

arranged for, and paid expenses associated with, these services and materials through her companies, BELLE and DETAILS.

9. In approximately June 2010, HAWKINS and HARRIS met and discussed what a GOTV effort in support of CAMPAIGN A would require. During this meeting, HAWKINS and HARRIS also discussed EXECUTIVE A's interest in supporting CAMPAIGN A. In connection with this meeting, HAWKINS drew up a GOTV plan and budget.

10. Sometime after his meeting with HARRIS, HAWKINS met with EXECUTIVE A and discussed, among other topics, the need for an effective GOTV effort in support of CAMPAIGN A. Following this meeting, HAWKINS and HARRIS spoke again about the budget for the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A and the need to get the budget to EXECUTIVE A.

11. Sometime thereafter, there was a three-way telephone call among HAWKINS, HARRIS, and EXECUTIVE A to discuss aspects of the budget for the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A. The budget included money to hire coordinators, canvassers, and drivers, and to rent vans, among other expenditures. As a result of this three-way call and subsequent discussions, the numbers in HAWKINS's initial budget were adjusted.

12. HARRIS hired a consultant, PERSON TWO, to coordinate the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A. PERSON TWO initially had an office on the second floor of the building next-door to the CAMPAIGN A headquarters and shared that floor with CAMPAIGN A's GOTV coordinator. PERSON TWO's office was later moved to the lower floor of the same building.

13. PERSON TWO generally followed the GOTV plan that HAWKINS had prepared. HAWKINS had conversations with PERSON TWO about canvassers' activities in certain areas of the District of Columbia and other aspects of the EXECUTIVE A-funded GOTV effort during the weeks leading up to the primary election. HAWKINS also personally observed conversations between PERSON TWO and CAMPAIGN A officials during that time period. As the primary election approached, HAWKINS's role in the CAMPAIGN A GOTV diminished, and his role in the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A increased.

14. Based on HAWKINS's recommendation, PERSON ONE became the transportation coordinator for the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A.

15. HAWKINS also recommended vendors for the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A, including a rental company at Dulles airport to provide vans.

16. On at least one occasion during the Mayoral campaign, HAWKINS received a cashier's check from HARRIS and delivered it to a vendor for CAMPAIGN A to pay for additional copies of a handout (in support of CANDIDATE A) for canvassers to distribute.

**Efforts to Obstruct or Influence a Known or Contemplated Federal Investigation**

17. Beginning in at least the fall of 2011, HAWKINS knew that the U.S. Attorney's Office for the District of Columbia and the Federal Bureau of Investigation were conducting a federal investigation into allegations concerning CANDIDATE A's 2010 Mayoral campaign. HAWKINS read news articles about the federal investigation and knew from those articles that individuals associated with CAMPAIGN A and with the EXECUTIVE A-funded GOTV effort

in support of CAMPAIGN A were being contacted and asked to "come downtown" as part of the investigation.

18. In late November or early December 2011, PERSON ONE told HAWKINS that he had received a business card from a government investigator in his door. At some point, PERSON ONE also told HAWKINS that he had had a conversation with someone from the government about scheduling a time to meet.

19. Approximately one week after learning of the card received by PERSON ONE, HAWKINS relayed this information to HARRIS. A few days later, HAWKINS and HARRIS met and discussed the fact that individuals whom HARRIS had paid to provide services in support of CAMPAIGN A were meeting with representatives of the U.S. Attorney's Office for the District of Columbia as part of the federal investigation. HAWKINS and HARRIS further discussed the need for such individuals, specifically PERSON ONE, to be out of town for approximately two to four weeks in order to delay their meetings with law enforcement as part of the federal investigation. HAWKINS understood from the conversation that: a) HARRIS had had a conversation with EXECUTIVE A about the need for such people, including PERSON ONE, to be out of town for a period of time, and b) PERSON TWO, whom HARRIS had hired to coordinate the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A, was already away.

20. In or about December 2011, with knowledge of and in contemplation of a pending federal investigation, HAWKINS and HARRIS attempted to persuade PERSON ONE to leave town for an extended period of time, so that PERSON ONE would be unavailable to speak with

federal agents in the FBI's investigation of the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A.

21.     After meeting with HARRIS, HAWKINS told PERSON ONE that PERSON ONE needed to go out of town until a certain date, so that he would be unavailable during that time period to be interviewed by the U.S. Attorney's Office. They discussed that PERSON ONE had already intended to be away for a week or two, but that he needed to go away for longer. PERSON ONE raised concerns that he would miss catering opportunities if he left town for the longer time period, he needed that income, and he had expenses. HAWKINS replied that he would get back to PERSON ONE.

22.     Shortly thereafter, HAWKINS told HARRIS about his conversation with PERSON ONE. A few days later, HARRIS met with HAWKINS and gave him an envelope, which HAWKINS understood contained approximately $4,000 in cash, to give to PERSON ONE to cover his lost income and expenses for the longer time period that he would be away.

23.     After meeting with HARRIS, HAWKINS called PERSON ONE and asked to meet him in a supermarket parking lot in southeast D.C. There HAWKINS gave PERSON ONE the aforementioned envelope, which HAWKINS understood contained approximately $4,000 in cash. HAWKINS and PERSON ONE again discussed PERSON ONE going out of town.

24.     In or about January 2012, HAWKINS ran into PERSON ONE at a morning community meeting for a political candidate. HAWKINS and HARRIS later had a discussion about PERSON ONE being back in town and the need for him to be away for a longer period.

6

25.   HAWKINS told PERSON ONE that PERSON ONE needed to be out of town for a longer period of time, and PERSON ONE told HAWKINS that he would need additional funds.

26.   A short time later, HAWKINS relayed PERSON ONE's request for additional funds to HARRIS. Sometime thereafter, HARRIS met with HAWKINS and gave him an envelope, which HAWKINS understood contained approximately $4,000 in cash, to give to PERSON ONE.

27.   After meeting with HARRIS, HAWKINS called PERSON ONE and asked to meet him in the same supermarket parking lot in southeast D.C. There HAWKINS gave PERSON ONE the aforementioned envelope, which HAWKINS understood contained approximately $4,000 in cash. HAWKINS and PERSON ONE again discussed PERSON ONE going out of town.

**Efforts to Influence a Federal Investigation By Making False Statements to the FBI**

28.   On or about August 16, 2012, HAWKINS, accompanied by his lawyer, participated in a voluntary interview with two FBI agents and representatives of the U.S. Attorney's Office for the District of Columbia. During that voluntary interview, with knowledge of and in contemplation of a pending federal investigation, HAWKINS made the following statements, among others, that he knew to be false and misleading to the FBI:

    (a) That he did not know of anyone asked or told to go out of town who had been involved with CAMPAIGN A or the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A;

7

(b) That he never requested for anyone to leave town so that they could not come to the U.S. Attorney's Office or speak with federal agents;

(c) That he did not help or assist with sending anyone out of town so they would not be able to speak with federal agents in this investigation.

29.  These false statements were material, as they were capable of influencing the course of the FBI's investigation of the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A and obstruction of justice related thereto. HAWKINS's false statements on August 16, 2012, were made in an attempt to influence the federal grand jury investigation into the EXECUTIVE A-funded GOTV effort in support of CAMPAIGN A.

30.  HAWKINS engaged in the conduct described above knowingly and willfully and not because of accident, mistake, or other innocent reason.

This statement of the offense is not intended to constitute a complete recitation of all facts known by HAWKINS, but is, instead, intended to provide the necessary legal basis for the guilty plea.

RONALD C. MACHEN JR.
United States Attorney
D.C. Bar #447-889

By: *Ellen Chubin Epstein*
Ellen Chubin Epstein, D.C. Bar #442-861
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530
Ellen.Chubin@usdoj.gov
(202) 252-1773

**DEFENDANT'S ACCEPTANCE**

I have read every word of this Statement of Offense. Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

8/13/13
Date

Vernon Hawkins
Defendant

**ATTORNEY'S ACKNOWLEDGEMENT**

I have discussed this Statement of Offense with my client, Vernon Hawkins, and I concur with his decision to stipulate to this Statement of the Offense.

8-13-13
Date

William E. Lawler, III, Esquire
Attorney for Defendant Vernon Hawkins