UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 1:13-cr-227 (CKK) |
| v. | : | |
| | : | |
| VERNON HAWKINS, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| _____ | : | |

## GOVERNMENT'S REPLY MEMORANDUM IN AID OF SENTENCING

The United States submits this reply to defendant's memorandum in aid of sentencing.   In his memorandum, the defendant does not undermine the evidence demonstrating his participation in a series of closely-related offenses: (1) the shadow campaign campaign finance offenses; (2) obstruction in 2011-2012, twice paying the shadow campaign transportation coordinator to travel to avoid law enforcement; (3) false statements and obstruction in August 2012, lying to investigators about that travel/obstructive conduct, among other things; and (4) continued false statements and obstruction after entering his plea, denying knowledge of brokering a $10,000 cash payment to Close Relative.[1]   His attempts to discredit Person G's amply-corroborated description of the defendant's participation in that $10,000 payment fall well short of the mark.   Similarly, his attempt to cast his false denial as a failure of memory should not be credited, especially in light of his other lies to investigators and his recurring selective memory problems.   In short, the evidence establishes that defendant continued to obstruct justice after his purported cooperation plea.

---

[1] Throughout, we use the same nomenclature as our initial sentencing memorandum. Although the arguments herein take some length to lay out, the government believes it proportionate to defendant's memorandum and appropriate given the serious issues in this case.

1

The defendant's arguments about the U.S. Sentencing Guidelines lack legal and factual merit. The Court should find that the obstruction guideline, U.S.S.G. § 2J1.2, applies to the underlying offense, that defendant's further obstruction of justice after his plea warrants an enhancement under § 3C1.1, and that he does not merit credit for acceptance of responsibility, § 3E1.1.   Recognizing the full panoply of defendant's obstruction, the appropriate guidelines offense level is 16, with a guidelines range of 21 to 27 months incarceration, in Zone D.

In sum, considering the nature and seriousness of the offense, the importance of deterrence, the other sentences in related cases, as well as the defendant's age and physical health, the United States respectfully requests a sentence of 12 months of incarceration (below the low end of that range), followed by three years of Supervised Release – a sentence well within the range the defendant already agreed was "reasonable." Plea Agreement at ¶ 13.

## FACTUAL BACKGROUND – THE OFFENSES

### A.  The Nature and Circumstances of the Offenses

Defendant repeatedly minimizes and obscures the nature of his offenses.  Regarding his participation in the shadow campaign, the defendant offers no acceptance of responsibility or expression of remorse – choosing instead to shift blame to others.   But this is contrary to his own admissions that he conceived and drew up a GOTV plan and budget with Harris and Thompson, Statement of Offense ("SOO") ¶¶ 9-11, knew of the meeting to receive a "go" from Candidate A, 5/29/2013 302 at 3-4, and executed the plan by helping staff it (recommending Person One and vendors) and consulting with the shadow campaign field coordinator, who implemented Hawkins's GOTV plan. SOO ¶¶ 12-15.

Likewise, regarding his participation in *twice* paying the shadow campaign transportation coordinator (whom Hawkins hired for the position), the defendant again minimizes his

responsibility, blaming others and attributing the obstruction to others who had the "idea" and "instruct[ed]" Hawkins to "carr[y] out his assignment." Deft. Memo at 17.   His admissions in the statement of offense – and common sense – suggest that Hawkins was not some bit player who made a single mistake; he knew exactly what he was doing – obstructing a federal investigation. *See* SOO ¶ 20 ("[W]ith knowledge and in contemplation of a pending federal investigation, Hawkins and Harris attempted to persuade Person One to leave town for an extended period of time, so that Person One would be unavailable to speak with federal agents . . . .").

Even with respect to his lies to investigators about his own obstruction, Hawkins attempts to minimize his conduct, denying that it constituted obstruction, despite his admission that his payments in December 2011 and January 2012 to Person One were intended to make Person One unavailable, SOO ¶ 20, and that his lies to the FBI in August 2012 sought to "influence the federal grand jury investigation." SOO ¶ 29.

### B.  The Evidence Shows Defendant's Participation in the $10,000 Cash Payment on September 17, 2010 – and Defendant's Challenges Lack Merit

The evidence – Person G's statement and contemporaneous phone records, and bank records – amply establishes that the $10,000 cash payment to Close Relative took place, and that the defendant was involved in managing it.[2]   The defendant offers no contrary evidence.   Rather, he challenges the proof by claiming that the records are not corroboration and attacking the credibility of Person G's statement.   Defendant is incorrect: Person G's account is credible and is substantially corroborated.

---

[2] The defendant's implication (at 30) that "[t]he PSR correctly does not incorporate these new 'facts'" is misleading.   The PSR noted it could not "fully evaluate" the post-plea obstruction, deferring to the Court to "resolv[e] these issues." *Id*. at 27.

3

**1. The Phone Records and Bank Records Amply Corroborate the Involvement of Hawkins in Person G's Cash Payment to Close Relative**

The phone and bank records strongly corroborate Person G's testimony about the payment and Hawkins involvement in brokering it.   The bank records confirm that as of 1:33pm, Person G received a wire from Thompson of over $15,000 and that, thereafter, Person G withdrew $9,500 in cash in Anacostia and a further $1,000 at a bank branch on Hanover Parkway in Greenbelt (and bought gas nearby).   In short, they corroborate Person G's account of receiving money from Thompson to make a cash payment to someone whom Person G met in Greenbelt later that day.

The phone records corroborate the identity of the payee – and the involvement of Hawkins. The records first show calls and texts between Person G and Thompson in the morning.   Then, throughout the day, there are a series of calls wherein Hawkins speaks with Close Relative and Person G back-to-back – at 10:51am and 10:54am; again at 3:32pm and 3:33pm; and yet again at 4:56pm and 4:58pm – this last call culminating in a 5:00pm call between Person G and Close Relative, and immediately subsequent 5:03pm and 5:18pm calls between Hawkins and Close Relative.   Person G then had three further calls with Close Relative between 5:42pm and 6:54pm, with a call at 6:24 to Hawkins in between.   At 7:23pm (after Person G reports making the payment), the three then participate in another set of back-to-back calls through 7:33pm.   In short, the three are in near-constant telephone contact throughout the day, and particularly in the afternoon when Person G's withdrawals and trip to Greenbelt took place.   Thus, the calls do not simply show, as defendant would have it (at 37-38), merely that he knew Person G.

That Person G somehow received a large wire, made cash withdrawals, traveled to Greenbelt, and paid someone uninvolved with the very two people he was in near-constant

telephone contact with throughout the course of the afternoon strains credulity.   In sum, the phone and bank records not only corroborate what Person G was doing – but whom he was doing it with.[3]

## 2.   The Defendant's Theories Do Not Undermine Person G's Testimony

### a.   Person G's Statements were Consistent

The defendant argues that the Court should not credit "the dubious and constantly changing testimony of" Person G, labelling him "an inherently unreliable witness who changes his story." Deft. Memo at 2, 36.   These characterizations cannot withstand scrutiny, particularly once the Court reviews (as it has requested) the statements of Person G.[4]   The defendant points to Person G's initial July 18, 2014, interview where he was first asked about the incident.   As noted in the Agent Declaration, Person G initially, erroneously, believed the incident was after the general election, not the primary.   7/18/2014 302 at 2.   Likewise, Person G "was unsure if Vernon Hawkins had any involvement in the $10,000 cash from Thompson to [Close Relative] or the Howard University students."   *Id.*   However, "[a]fter reviewing his bank and phone records,"

---

[3] This corroboration also definitively rebuts the defendant's conspiracy theory.   The defendant's theory seems to be that Person G acceded to a government decision to frame Hawkins (a friend of his from church) by implicating him in the $10,000 cash payment of which Hawkins had no knowledge and involvement.   What a coincidence then, that on September 17, 2010 – the very day identified in Thompson's March 2010 statement of offense, months before Person G even spoke with investigators – Person G's bank records not only reflect the payment, his phone records also show a densely-connected set of calls between Hawkins, Person G, and Close Relative at the exact time and date of that payment.   The records are not coincidence; they are the very essence of corroboration.

[4] As ordered by the Court, the government will file, under seal, all such statements of Person G about this $10,000 payment.   *See* Order of April 12, 2016 (requiring the filing of "all statements made by 'Person G' to the Government regarding Defendant's involvement with the $10,000 cash payment . . . for the Court to review").

Agent Decl. at note 3, Person G's recollection was refreshed.[5]   Thereafter, in a subsequent July 31

interview and August 12, 2014, grand jury testimony, Person G consistently described in detail his

phone calls/contact with Hawkins in relation to this $10,000 cash payment.   *See* 7/31/2014 302 at

2; GJ at 27-30, 35-40.

Nor did Person G distort or over-emphasize the role of Hawkins.   To the contrary, Person

G stated that the initial call about the payment (and the money to do so) came from Thompson, GJ

at 27-30, that the payment was to Close Relative, *id.*, and that Hawkins was involved as a

"manager," 7/31/2014 302 at 2, or "an executive," "trying to get something done, just get on and

get it taken care of." GJ at 38.   Hawkins's role was dealing with the students who needed to be

paid for GOTV related to the election.   GJ at 29, 35-36.[6]

Beyond needing his recollection refreshed, the defendant identifies no inconsistencies in

Person G's account of the payment or Hawkins's involvement in it.   Nor does the defendant point

to any contradictions between Person G and the bank and phone records.   In short, once Person G

had an opportunity to recall the incident, he consistently and accurately described what happened –

and his account was amply corroborated by his phone and bank records.[7]

---

[5] That Person G honestly needed to have his recollection refreshed is substantiated by this error about the general versus primary election, an example of a small but genuine – and easily corrected – mistake in remembering events some four years before.

[6] Defendant quibbles with Person G's description of him as a "manager" "in the movement of money from Thompson to [Close Relative]." 7/31/2014 302 at 2.   But "manager" was the term Person G used.   Quoting it does not "overstate[]" the facts.   Deft. Memo at 36-37. In any event, because the government is providing the Court with all of Person G's statements about this transaction, the record will be clear that Person G stated and testified precisely as the government indicated: that Hawkins played a key role in setting up the meeting and making sure the money was received in order to pay the students.   *See* 7/31/2014 302 at 2; GJ at 35-40.

[7] Desperate to identify contradictions, defendant (at 36) instead cites one instance from Person G's description of his other conduct (the "Other Conduct"), unrelated to the $10,000 cash

As noted in the Agent Declaration, Person G has three criminal convictions, all over ten years old, the last of which was in 2004.   While impeaching, there is no particular reason to think that substantially aged criminal convictions as these particularly undermine Person G's account.

### b. Person G's Alleged "Motive to Curry Favor" Does Not Withstand Scrutiny

Defendant also lays out a theory that Person G had "significant criminal exposure" and thus "compelling motivation . . . to do and say exactly what the government wants." Deft. Memo at 34-35.   The evidence does not support this claim.   Preliminarily, as defendant concedes (at 33), Person G was aware of his Fifth Amendment rights.   With counsel, Person G reached a non-prosecution agreement that he would "truthfully and completely disclose all information with respect to . . . himself and others" while the government would "not criminally prosecute [him] for any crimes related to . . . federal and District of Columbia campaign finance violations" and related offenses.   Notably, the agreement "d[id] not provide any protection against prosecution for any [other] crimes."   *See* Deft. Memo at 35 (conceding same).   In short, Person G did not receive immunity for the Other Conduct – and yet was still willing to discuss it with investigators.   This alone definitively rebuts defendant's claim that Person G had a "strong motive" or fear of prosecution related to any Other Conduct.

Referencing the government's disclosure about the Other Conduct, the defendant (at 33-35) overstates and exaggerates that material, listing a series of offenses for which he speculates

payment and Hawkins.   That is, in the course of a single interview on April 10, 2015, Person G described Other Conduct; among other things, █████████████████████████████████████████████████████████████████████████████████████████████████████   But this single instance is more reflective of Person G's initial candor (that is, truthfulness), followed by minimizing and qualifying.   This does little to undermine Person G's credibility since, but for Person G's candor, the government would not have known of this adverse information.

Person G has "criminal exposure" and generating claims about what sentences Person G faces under such charges.   In fact, as the government's disclosure makes clear, Person G's description of his Other Conduct was no admission of criminal culpability.   To the contrary, Person G *denied* the *mens rea* at the heart of the charges the defendant conjures up.   Moreover, as to other claimed offenses (such as ███████████████████████████████████████ ███████████████████████████████) the evidence is so lacking that anyone, including Person G, would know criminal charges could not be brought.[8]

### C. On March 7, 2014, the Defendant Willfully Lied to Investigators About The $10,000 Cash Payment to Close Relative

### 1. Hawkins's Claims of Memory Failure Should Not Be Credited

The defendant's claim – that his denial was "the result of confusion, mistake, or a faulty memory," Deft. Memo at 30 – is contradicted by the evidence.   In light of the defendant's other false statements and a pattern of selective memory loss to protected uncharged individuals close to him, the Court should not credit his claim that his denial was simply a failure of memory.

### a. Defendant's False Denial Was No Temporary Mistake or Misunderstanding of a Peripheral Question

Preliminarily, the Court should reject certain defense mischaracterizations.   That is, defendant misleadingly argues (at 30-31) his failure of recollection was no more than a response to a passing question on March 7, 2014 – and that somehow the evidence showing that Hawkins's

---

[8] Not content to distort Person G's admissions about the Other Conduct, the defendant speculates (at 35) that Person G may have "participat[ed] in additional . . . criminal activities." Similarly, despite Person G's express denial of ██████████████████████, and despite no evidence that he committed any, defendant urges the Court to "suspect" that Person G committed them.   *Id.* at 34 n.1.   This novel principle – impeaching a witness with crimes for which there is no evidence, and which they have denied – is repugnant to American jurisprudence.   The Court should decline defendant's invitation to discount testimony in this manner.

denial was false is "newly provided." The picture he tries to paint is false. It is correct that a full proffer was not given during defendant's March 7 interview – and could not have been, as Person G had not yet been interviewed; the interview questions were premised on Thompson's statement. But this was no temporary failure of recollection or misunderstanding of a peripheral question.

On October 5, 2014, prosecutors made a detailed proffer to defense counsel of the evidence establishing the defendant's involvement in and knowledge of the payment (that is, the evidence set forth in the Agent Declaration). In response, defendant's counsel did not proffer any different recollection, thereby maintaining his false denial, and declined an offer by prosecutors to present the same to the defendant personally. Thereafter, between November 19, 2014, and January 30, 2015, the parties engaged in correspondence in which prosecutors notified defendant's counsel that they viewed defendant as in breach of his plea agreement and that, therefore, he may be criminally charged related to the March 7, 2014 false statement, among other things.

That the defendant has maintained his false denial of any knowledge about the payment thereafter, despite significant attention to the issue, confirms that his denial on March 7 was not an accident, mistake, or temporary failure of recollection. To the contrary, as observed in the Agent Declaration, the defendant's change in demeanor when answering questions about the payment to Close Relative bore the indicia of intentional, conscious deception – a long pause, accompanied by discomfort in answering the questions.

Moreover, this was no bland, unmemorable incident – it involved a $10,000 cash payment to a close relative of Candidate A, days after the election, all from the city's largest contractor. If anything, defendant's statement that he could not recall the incident – rather than a flat denial ("nothing like that ever happened") – is a "tell"; most people, asked if they were involved in such

$10,000 cash payment to a close relative of Candidate A (or any candidate) days after the election, would easily, unhesitatingly, and definitively state, "no."   To claim (as defendant does) that such a payment may have happened, but he could not recall it, is truly incredible.

     **b.  Defendant's Claimed ███████████████████ Does Not Withstand Scrutiny**

The defendant attempts to defend his selective memory loss by pointing to ███████ ████████████████████████ cannot bear the weight defendant tries to place upon it.

███████████████████████████████████████████████████████████

███████████████████ – that is, well *after* the defendant had significant incentive to manufacture claims of memory failure.   By that time, the government had not only confronted defense counsel with a detailed proffer of the evidence of Hawkins's involvement in a payment to Close Relative, the government had also notified the defense that it viewed Hawkins's denials as false, in breach of his plea agreement.[9] ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████

Second, ██████████ did not review or consider the detailed statements the defendant gave investigators during his interviews on a variety of topics – detailed memories that would contradict his performance during the assessments.   This real-world and real-life demonstration of the defendant's memory – among other things, descriptions of meetings with, and payments to,

---

[9] As noted above, in correspondence between November 19, 2014 and January 30, 2015, prosecutors put defendant on notice of his breach of the plea agreement and the potential that he would be criminally charged related to the March 7, 2014 false statement, among other things. This was just before ████████████████████████.

Person One, and phone calls with Harris and Thompson about the shadow campaign – belies the

claim ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

Finally, ████████████████████████████████████████████████

████████████████████████████████████ the Court should factor that bias into

its consideration.   In sum, because Hawkins had ample motive to manipulate ████████████

and because ██████████████ did not consider his (selectively) detailed recollections during his

interviews with criminal investigators, the Court should not credit ██████████████.

### c. Defendant's Other False Statements – and Selective Memory Loss – Corroborate that His False Denial Here Was a Willful Lie

Finally, because the defendant lied about other matters to investigators (and pleaded guilty

to one such set of lies) and otherwise demonstrated a pattern of selective memory loss, the Court

can reasonably conclude that this denial, too, was a deliberate falsehood.   As the defendant

admitted, he lied during his August 16, 2012 interview – and he lied purposefully.   He falsely

denied knowing of witnesses asked or told to go out of town, falsely denied that he requested

anyone to leave town to avoid investigators, and falsely denied that he helped send anyone out of

town, SOO ¶ 28 – all knowing full well that those were blatantly untrue.[10]   Nor were these

---

[10] In assessing the willfulness of Hawkins's false denials, the Court should also consider his underlying obstruction through such witness travel.   Such action reflects Hawkins's motive to lie, in this and other instances: his determination to prevent investigators from uncovering the truth about the shadow campaign and thereby to protect uncharged individuals from prosecution for it.

Hawkins's only false statements; in that interview alone, he also made false statements about the shadow campaign, statements he admitted were false in the SOO.

In addition, the defendant's pattern of selective memory loss – omitting evidence against uncharged individuals and/or denying any first-hand knowledge (*i.e.*, admissible evidence) against those he sought to protect, such as Candidate A and, initially, Thompson – suggests that his denial of knowledge about the $10,000 payment to Close Relative was willful as well.   As previously noted, Hawkins did not have such significant failure of recollection when describing other details and sequences of events – those that inculpated Harris and, later, Thompson, for example.

Demonstrating his selective memory, in his interviews, Hawkins artfully shaped his recollection of phone calls.   Regarding Harris, he could recall the details of various inculpatory phone calls about the shadow campaign and the obstruction in some detail – discussing budgets and GOTV plans in calls, SOO ¶¶ 9-11, Harris's report on a dinner with Candidate A and Thompson at which Harris received a "go," 5/29/2013 302 at 3-4, and conversations about the obstruction, discussing the need for shadow campaign workers to be out of town, SOO ¶ 19.

But regarding the uncharged Candidate A, the defendant could recall no inculpatory conversations.   That is, although Hawkins stated that he did not try to conceal his GOTV activities from Candidate A, and that he *could* have talked openly to Candidate A about the shadow campaign, he did not recall if he did and, subsequently, implied that he specifically did not. 3/7/2014 302 at 6-7.   In support of this claim, the defendant falsely asserted that the reason was distance between himself and Candidate A related to a canvasser pay dispute.   *Id*. at 7.   But the investigation determined this incident was on September 10, 2010, *see* Agent Decl., just days before the election and well after the shadow campaign GOTV operations were running.

Similarly, although the defendant would offer an opinion that he had "no doubt" about the candidate's knowledge, he denied any first-hand knowledge, offering as reasons only Harris's statements and his own speculation.  *Id*. At 6-7.  As defendant could expect, such limited concessions were unlikely to advance the government's case against uncharged individuals.[11]

Indeed, the defendant's motive for his selective memory loss – to protect uncharged individuals – permeates his handling of this very issue related to the September 17, 2010 payment. As part of his plea, the defendant admitted his knowledge of, and participation in, the shadow campaign, which involved far more money from Thompson – hundreds of thousands of dollars in unreported campaign contributions. Participation in this particular payment would not significantly affect the level of Hawkins's personal culpability for the shadow campaign or otherwise reveal conduct inconsistent with the defendant's known actions.  Why, then, with respect to this comparatively small payment, which was entirely consistent with how the defendant conducted his other campaign activities, does he direct such vitriol at Person G, denying that his account is credible?   The answer is obvious: as with so many instances of his selective memory loss, the defendant remains determined to protect uncharged persons close to him, such as Candidate A and Close Relative.

\*        \*        \*

---

[11]  Defendant claims that "[t]o the extent that [he] could remember events he was asked about, he willingly shared . . . information." Deft. Memo at 32.   But the example he provides – his recollection that he took an unopened envelope with unknown contents from Thompson to Close Relative, Deft. Memo at 32-33 – only underscores the government's point and demonstrates Hawkins's selective memory: what he "remembered" about Candidate A or his Close Relative was meaningless and thus unlikely to advance the case against those he sought to protect.

As previously noted, at the Court's request, the government is prepared to provide copies of Hawkins's interview memoranda so that the Court may review these issues for itself.

Person G's account of the $10,000 payment is credible and is substantially corroborated, and the Court should credit it (by a preponderance of the evidence).   By contrast, the defendant's claimed failure of memory about this payment is not credible. Therefore, the Court should find that the defendant falsely denied knowing of the payment to Close Relative on March 7, 2014.   In light of that finding, and in recognition of the seriousness of obstructing the investigation after entering into a plea agreement that obligated the defendant to provide complete and truthful cooperation, the guidelines calculation and the appropriate sentence should be adjusted upward.

## U.S. SENTENCING GUIDELINES CALCULATION

As previously explained, the defendant's guidelines offense level calculation should be:

| | |
|---|---|
| Base Offense Level – U.S.S.G. § 2J1.2 | 14 |
| Adjustment for Obstruction – U.S.S.G. § 3C1.1 | +2 |
| Acceptance of Responsibility – U.S.S.G. § 3E1.1 | 0 |
| Total Offense Level | 16 |

The defendant disputes each of these elements.[12]

### A.  The Proper Guideline/Base Offense Level

#### 1.  The Obstruction Guideline, U.S.S.G. § 2J1.2, Should Be Used for the Underlying Offense

Because "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline," U.S.S.G. § 2B1.1(c)(3), that is, obstruction of justice under at least 18 U.S.C. § 1512(b)(3) (and other identified obstruction statutes), the Court should use the obstruction guideline § 2J1.2 for the base offense level.

---

[12] In a tacit admission that the defendant has not, in fact, been truthful with investigators and otherwise cooperated as required by his plea agreement, nowhere in his sentencing memorandum does he claim to have fulfilled its terms or be entitled to any cooperation credit under § 5K1.1.   Indeed, far from detailing any cooperation or "substantial assistance" provided, as virtually all cooperators do in their sentencing memoranda, the defendant instead attempts to defend his lack of assistance as a failure of memory.

14

First, in assessing "the conduct set forth in the count of conviction," the Court is not limited to the literal words of the charging document.  Though he struggles mightily, the defendant cannot avoid that the Guidelines provision refers to offense "conduct" (as distinguished from all relevant conduct) and that, far from drafting the provision in a way to limit consideration to the indictment or information, the recent Guidelines amendment *struck* reference to those very documents.  The Court may therefore permissibly consider the charging document, reasonable inferences about offense conduct therein, and all offense conduct underlying the charged offense, including descriptions of that conduct in the statement of offense.

Second, even were the Court limited to the Information, the cross-reference guideline applies because Information ¶ 8 plainly establishes a violation of Section 1512(b)(3).

Third, if the Court agrees that § 2B1.1(c)(3) permits the Court to consider all offense conduct underlying the count of conviction, including conduct in the SOO, the cross-reference applies because, in addition to a violation of Section 1512(b)(3), the SOO also established violations of Sections 1503 and 1512(c)(2).[13]

---

[13] The defendant inaccurately claims that somehow the government changed its position or otherwise unfairly contends that the obstruction guideline applies.  *See* Deft. Memo at 4 ("Having agreed to a § 1001 plea, [the government] should not in effect seek to sentence Mr. Hawkins under the obstruction of justice guidelines.").  Nothing could be further from the truth.  In the plea agreement and at the plea hearing the parties specifically "agreed to disagree" on this very issue, with the government contending that § 2J1.2 applied.  *See* Plea Agreement at 3 ("applicable guideline is § 2J1.2"); Plea Transcript at 53-54 (discussing "the Government's view" that § 2J1.2 regarding "obstruction of justice" applies).   The government has consistently maintained that the offense conduct constituted obstruction of justice.

Further, contrary to the defendant's misleading citation (at 3) to the U.S. Attorneys' Manual, there is no weight to be given to the fact that the government and the defendant reached a compromise plea agreement requiring the defendant's cooperation and guilty plea to one criminal offense as opposed to another.   There are many considerations, for both parties, in reaching plea agreements.   Indeed, USAM § 9-27.430, the provision cited by the defendant, specifically

a.   **Legal Authority: Conduct to be Considered**

The defendant argues that the "conduct set forth in the count of conviction" means that "the Court cannot rely on material found outside of the Information." Deft. Memo at 4.   But his argument does not examine the language of § 2B1.1(c)(3) itself and ignores the history of Amendment 617 which created it.   There is no indication in Amendment 617 that the Sentencing Commission intended to introduce a limitation on the scope the material courts could consider in assessing the cross-reference.   To the contrary, had the Sentencing Commission sought to create such a limit, it could easily have drafted the provision to do so (*e.g.*, "If . . . (C) the allegations in the count of conviction of the indictment or information establish an offense . . ."").   But the Sentencing Commission did not refer to allegations or charging language – it referred to "conduct." In context, then, the plain meaning of "conduct set forth in the count of conviction" refers to all offense conduct, in contrast to the broader "relevant conduct" otherwise used by the Guidelines.   Far from limiting consideration to "the indictment or information," the Commission *struck* the reference to those documents from this guidelines section.

The Commission's usage of "conduct" matches its earlier use of "offense conduct" as contrasted with "relevant conduct" in the general section directing how to determine the applicable guideline.   *See* § 1B1.2(a) ("Determine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (*i.e.*, the offense conduct charged in the count of the indictment of information of . . . convict[ion])"); *compare* § 1B1.2 (determine the applicable guideline range within the guideline section based on "relevant conduct").   In short, "conduct set

recognizes that "unusual circumstances" may affect charges in plea agreements, particularly "situations involving cooperating defendants," which have additional considerations. *See also* USAM § 1-1.100 (USAM is only internal "guidance" and "may not be relied upon" for other purposes, as the defendant attempts here).

16

forth in the count of conviction" refers to all offense conduct.

Moreover, defendant's position creates perverse incentives and irrational results. That is, in a case such as this, where specific falsities violate both Section 1001 and Section 1512(b)(3) (and other obstruction statutes), the defendant's interpretation would effectively mandate that a cautious prosecutor ensure that a two-count indictment for such charges include the charging language for Section 1512(b)(3) twice – under the heading for each count. Such charging would be subject to a motion to dismiss challenging the count with the double-language as duplicitous. The obstruction language could also be struck as surplussage. If retained, the language could cause significant juror confusion. Such a scenario cannot have been the result the Sentencing Commission intended.

Lacking textual support in the Guidelines, the defendant turns to precedent. But he cites no clear precedent for his proposition that "the government is bound by the words that actually appear in the pleading." Deft. Memo at 6. Thus, his argument is based on a misnomer – "conduct set forth in the count of conviction" means, he asserts, *language* or *allegations* set forth in the indictment. But this is not what the guideline says; it says "conduct."

The primary case defendant presents, *United States v. Griffith*, 115 F. Supp. 3d 726 (S.D.W. Va. 2015), addresses such different context that it provides little support for his argument. There, the court primarily addressed the question of whether a kickback scheme running from 2002 to 2008 (or 2010), *id*. at 729, could constitute "relevant conduct" where the defendant pled guilty to one count of false statement related to a 2014 interview with IRS agents. *Id*. at 730. Unsurprisingly, the court found that the kickback scheme was not relevant conduct as it was "not the offense of conviction" and did not occur during the "offense of conviction" – indeed, the

scheme had terminated at least four years before the false statement.   *Id*. at 732-33.   As a fall-back argument, the government contended the scheme qualified under the cross-reference. But because it was not even relevant conduct, this argument was a stretch, to say the least.   The court rejected the argument that it was sufficient if "the charging language *implicates* another offense"; instead, it required that "the count of conviction" must "establish the elements of the additional offense." *Id*. at 743.   As the decision there was easy (the kickback scheme was not relevant conduct and thus not offense conduct either), it did not address how the court would view a case where the "*conduct* set forth in the count of conviction" – that is, false statements to investigators – itself established a different offense, such as obstruction.

Another case cited, *United States v. Genao*, 343 F.3d 578 (2d Cir. 2003), recognizes that "conduct" is part of the guidelines phrase.   But its discussion of the "conduct set forth in the count of conviction" does not directly address whether the "conduct" includes descriptions of such offense conduct in the statement of offense.   Nor did it have to; as the decision noted, there, even if the court "were able to consider conduct not specifically alleged in the indictment," the government had not established alternate obstruction offenses.   *Id.* at 585.

In short, neither *Griffith*, nor the other cases defendant cites can rewrite the Sentencing Guidelines.   Because the Sentencing Guidelines do not impose such a limitation, the Court should not artificially truncate its evaluation of the "conduct set forth in the count of conviction."

### b.   The Information Establishes a Violation of Section 1512(b)(3)

But even if the Court looks only to the Indictment, all the elements of a Section 1512(b)(3) violation are established.   That is, the cross-reference applies even under the defendant's reading of § 2B1.1(c)(3).   The defendant's memorandum largely ignores Section 1512(b)(3),

despite the fact that the government emphasized this very provision in its March 18, 2016, letter to the PSR writer.   As previously explained, Information ¶ 8 plainly makes out each and every element of a violation of Section § 1512(b)(3).   With no substantive response, defendant hides from the issue.   First, defendant engages in an extended discussion (at 9-12) of "corruptly" – and particularly whether the defendant "corruptly" persuaded a witness.   But this is just a lengthy *non sequitur*, as defendant's argument applies to Section 1512(b)(1), not 1512(b)(3).

No more persuasive is defendant's attempt (at 12-13) to read a new element into a Section 1512(b)(3) offense, claiming that the statute requires that the defendant "us[e] a third party as a conduit for [the mis-]information." But Section 1512(b)(3) has no such requirement; the operative phrase is "misleading conduct toward another person," which has repeatedly been given its unambiguous, easily-understood meaning: *any* person, including agents.   Defendant cites no authority to the contrary.   Nor could he: case after case has rejected this "conduit" argument – that the misleading conduct "must" be directed at a third-party witness, not a law enforcement officer.

In *United States v. Veal*, 153 F.3d 1233, 1244-47 (11th Cir. 1998), *abrogated on other grounds by Fowler v. United States*, 563 U.S. 668 (2011), *as described in United States v. Chafin*, 808 F.3d 1263, 1273-74 (11th Cir. 2015), the Eleventh Circuit definitively rejected claims that misleading conduct toward "another person" does not cover law enforcement officers.   In *Veal*, the false statements were made to state law enforcement officers, *id*. at 1245; thus, the Circuit did not have occasion to hold that federal law enforcement agents also fell within the statutory term "another person."   But its reasoning was clear: the "another person" to whom the misleading conduct is directed includes *any* person.   *Id*.   The Eleventh Circuit rejected the argument that the "another person" must be a third party "witness, victim, or

informant" other than law enforcement, *id*. at 1246 – the very "conduit" argument defendant attempts here.   In short, there is nothing in Section 1512 or *Veal* that supports defendant's claim that the obstruction must occur through a "conduit."

Similarly, in *United States v. Smith*, 2001 WL 1568851, slip op. at 3-4 (N.D. Ill. Dec. 10, 2001), the Court likewise rejected an identical argument regarding federal agents, reiterating that the statute covered misleading conduct toward "another person," an unambiguous term "easily and commonly understood to mean *any* person," including law enforcement officers.   *Id*. (citation omitted).   Other courts have reached the same conclusion.[14]

Defendant nowhere grapples with the unambiguous statutory language or explains how his argument differs from those that have already been rejected.   In sum, defendant all but concedes that the Information establishes obstruction of justice in violation of Section 1512(b)(3).

c. **The Conduct Set Forth in the Count of Conviction – Including Descriptions of that Conduct in the SOO – Establishes a Violation of Sections 1503 and 1512(c)(2)**

The offense conduct in the count of conviction, that is, the defendant's August 16, 2012 lies to investigators about the witness travel obstruction, as further described in the statement of offense, also establishes a violation of Section 1503.   All the elements are met: First, defendant agreed there was a "pending proceeding before a . . . grand jury."   *See* SOO ¶ 29.   Second, the

---

[14] *See United States v. Cotton*, 2006 WL 2927675, slip op. at 2-3 (E.D. Mich. 2006) (rejecting conduit witness theory; Section 1512(b)(3) covered false statements to federal investigators); *United States v. Gardner*, 993 F. Supp. 2d 1294, 1300-1302 (D. Or. 2014) (rejecting argument that statute "applies only to victims, witnesses, and informants"); *cf. United States v. Rand*, 482 F.3d 943, 947 (7th Cir. 2007) (citing *Veal*, agreeing that Section 1512's term "another person" is "easily and commonly understood to mean any person"); *United States v. Ring*, 628 F. Supp. 2d 195, 222 (D.D.C. 2009) ("It is therefore irrelevant to whom a defendant made false statements, so long as the statements were made with the intent to thwart an inquiry into a possible federal crime by officials who happen to be federal.").

defendant "knew of the pending judicial proceeding and . . . endeavored to influence . . . the due administration of justice in that proceeding." *See id*. (false statements were material and "made in an attempt to influence the federal grand jury investigation into the [shadow campaign]." Third, he acted "corruptly." *Id*. at ¶ 30 (conduct was "knowing[] and willfull[]").

The defendant's response regarding this Section 1503 offense is, as discussed above, that the Court may not consider the SOO, even as it relates to the *same offense conduct* – his lies on August 16, 2012.   Deft. Memo at 8.   In short, he argues, because the "grand jury" is not mentioned in the Information, obstructing the grand jury – even through the very same false statement in the count of conviction – may not be considered.   This argument reveals the frivolousness of defendant's legal argument – although the same offense conduct is involved, the guideline (in defendant's view) depends upon whether the specific intent to also obstruct the grand jury was also spelled out in the Information.

Were the Court to consider the SOO, the defendant nonetheless contends (at 13) that under *United States v. Aguilar*, 515 U.S. 593, 600-01 (1995), the government has not established the requisite *mens rea*.   But *Aguilar* only requires that "[t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings." 515 U.S. at 599.   Because he agreed in the SOO that his false statements were material and were "made in an attempt to influence the federal grand jury investigation into the [shadow campaign]," *id*. at ¶ 29 – the very language in *Aguilar* – it is difficult to understand what defect defendant claims.

The same aspects of the offense conduct that support the Section 1503 violation – that is, defendant's false statements on August 16, 2012 – also establish at least one other obstruction offense, a violation of 18 U.S.C. § 1512(c)(2).

### 2. § 2B1.1 Otherwise Recognizes that the Sentence Should Reflect the Seriousness of the Offense

Because the defendant's argument relies virtually entirely on a procedural claim – that § 2B1.1(c)(3) prohibits the Court from looking beyond the Information in assessing the cross-reference provision – he ignores that § 2B1.1 contemplates that the sentence (and the offense level) adequately reflect the seriousness of the offense, if only through an upward departure. *See* U.S.S.G. § 2B1.1, Application Note 20(A) ("an upward departure is warranted [where a] primary objective of the offense was an aggravating, non-monetary objective"); *Genao*, 343 F.3d at 586 (providing false statements to investigators is such an objective). Other guidelines provisions similarly instruct courts to consider the seriousness of such obstruction. *See* U.S.S.G. § 5K2.7 (contemplating increased sentence above the guidelines range where the "defendant's conduct resulted in a significant disruption of a governmental function," including obstruction of justice). The Guidelines permit courts to determine the offense level in a manner that reflects the nature and seriousness of the offense.

### 3. Should the Court Agree with Defendant that § 2B1.1 (not § 2J1.2) Applies, A Two-Level Enhancement for Obstruction under § 3C1.1 is Warranted

As set forth above, the Court should use § 2J1.2 as the base offense level. However, should the Court conclude it cannot do so (*i.e.*, agree with the defendant's position about what material may be considered under § 2B1.1(c)(3) and find that the material does not make out an obstruction violation), and thus use the § 2B1.1 base offense level defendant urges, the Court should nonetheless apply a two-level enhancement under § 3C1.1 related to the underlying offense conduct, making the offense level (even under defendant's theory) at least level 8, before considering defendant's post-plea obstruction/false statements.

**B.  An Adjustment for Obstruction of Justice Applies**

Defendant's post-plea false statements/obstruction warrant a two-level enhancement under U.S.S.G. § 3C1.1, which provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

Focusing on the first prong ("with respect to the . . . instant offense of conviction"), the defendant argues (at 39) that the obstruction enhancement under § 3C1.1 does not apply unless the government can show his obstruction related to the specific "offense of making false statements about [Person One] being asked to go out of town."

But defendant is wrong as a matter of law.   The Guidelines include obstruction "with respect to" his offense and all relevant conduct as well.   That is, the Guidelines phrase "instant offense of conviction" intended to distinguish the "instant" offense from prior or subsequent offenses; it "refers to <u>the offense of conviction including relevant conduct</u>."   *United States v. Self*, 132 F.3d 1039, 1043 (4th Cir. 1997) (emphasis added); *see also id.* at 1044 ("[t]he term 'instant' is used in connection with 'offense,' . . . to distinguish the violation for which the defendant is being sentenced from a prior or subsequent offense, or from an offense before another court.").   Indeed, clarifying that "instant offense" includes relevant conduct was the Sentencing Commission's express purpose in amending § 3C1.1. *See* Amendment 581, U.S.S.G. Manual, Appendix C, Vol. II at page 13 ("The purpose of this amendment is to clarify what the term 'instant offense' means in the obstruction of justice guideline, §3C1.1. This amendment resolves a circuit conflict . . . . The amendment, which adopts the majority view, instructs that the

obstruction must relate either to the defendant's offense of conviction (including any relevant conduct) or to a closely related case."). *See also United States v. Mollner*, 643 F.3d 713, 716-19 (10th Cir. 2011) (recounting history of amendment, breadth of § 3C1.1); *United States v. Hughes*, 401 F.3d 540, 559 (4th Cir. 2005) (guideline includes relevant conduct); *United States v. Verdin*, 243 F.3d 1174, 1180 (9th Cir. 2001) (recounting amendment; guideline "include[s] obstructions in a closely related case, such as that of a co-defendant").

Because the Guideline contemplates an adjustment for obstructive acts with respect to relevant conduct, there can be no question that Hawkins's false denial (*i.e.*, obstruction) of a cash payment related to GOTV/campaign expenses was an obstruction "with respect to the investigation, prosecution, or sentencing" of his offense, including all relevant conduct (such as the underlying shadow campaign/campaign finance investigation).   Indeed, it was of a piece with Hawkins's other obstructive efforts to thwart the investigation.   "§ 3C1.1 applies not only to the defendant's obstructive conduct involving his offense of conviction, but also to any of his obstructive conduct involving cases that are closely related to the defendant's case."   *United States v. Mollner*, 643 F.3d 713, 716 (10th Cir. 2011); *see also United States v. Acuna*, 9 F.3d 1442, 1446 (9th Cir. 1993) ("attempts to obstruct justice in a case closely related to his own, such as that of a codefendant") (internal quotation omitted).   Even refusing to provide information can warrant an obstruction enhancement.   *See United States v. Williams*, 922 F.2d 737, 739 (11th Cir. 1991) (a defendant's "refusal to testify at a co-conspirator's trial after an immunity order had been issued clearly constituted conduct within" § 3C1.1).

The defendant also disputes (at 40) whether his false denial of knowledge about the $10,000 payment to Close Relative was "a materially false statement to a law enforcement

officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense."   § 3C1.1, Application Note 4(G) (one of the "non-exhaustive" examples of covered conduct).   As the statements of Person G made clear, Hawkins was working with Close Relative in both receiving the cash and disbursing it to student canvassers, part of a campaign GOTV effort; in short, Hawkins had personal knowledge of at least Close Relative's receipt of the cash and the campaign-related purposes to which it was put.   Thus, Hawkins's testimony was material to a potential prosecution of Close Relative for campaign finance (or other) offenses related to the payment.   Without the defendant's testimony, the government not only lacked a critical witness with first-hand knowledge of the offense, it now had a purported cooperating witness who (were Close Relative charged) would deny knowledge of the offenses Person G described.   Hawkins's denial is thus a "materially false statement." *See id.*, Application Note 6 ("'Material' evidence. . . means evidence . . . that, if believed, would tend to influence or affect the issue under determination.").

Finally, defendant concedes that § 3C1.1 may be applied notwithstanding that the base offense level for his conviction is § 2J1.2 (Obstruction) where "a significant further obstruction occurred during the investigation, prosecution, or sentencing of the offense itself." § 3C1.1, Application Note 7.   As described above, defendant's false statement was highly material to the potential prosecution of Close Relative, and thus constitutes significant further obstruction.

In sum, defendant cannot disturb the conclusion that an obstruction enhancement is warranted for his false statements/obstruction about his own relevant conduct – that is, brokering a campaign-related cash payment from Thompson immediately after the shadow campaign – and the participation of others in that underlying offense.

**C.  No Adjustment for Acceptance of Responsibility is Warranted**

The defendant does not deserve an adjustment for acceptance of responsibility for two independent reasons: (a) his obstruction/false denial about the $10,000 payment and (b) his denying and minimizing his series of criminal offenses.  *See* U.S.S.G. § 3E1.1 (adjustment awarded only when "defendant clearly demonstrates acceptance of responsibility for his offense").  The defendant (at 16) does not dispute that, if the Court credits the evidence that he falsely denied knowledge of the $10,000 payment, no credit should be awarded. *See* §3E1.1, Application Note 1(A) and 3; *United States v. Anderson*, 259 F.3d 853, 862 (7th Cir. 2001) (presumption of no credit where court applies obstruction enhancement under § 3C1.1).

As to his denials, minimization, and related lack of remorse, the defendant claims (at 14, 18) to have "accepted responsibility" – but, as his own memorandum attests, that acceptance goes no further than acknowledging "his false statement to investigators," which he describes as an "isolated mistake."  Even this claimed "acceptance" (at 14-16) omits any detail of his offense, begging the question of what he is accepting responsibility and apologizing for.  Moreover, he refuses to truly acknowledge his participation in the underlying campaign finance offense and obstruction of that investigation, that is, paying Person One to travel and knowing that other witnesses were likewise sent out of town to obstruct the investigation – all of which put his August 2012 lies to investigators in context.  To the contrary, he seeks (at 15, 17) to blame "the illegal campaign finance activities" on "others" and likewise claims others "mastermind[ed]" and funded the plan to send Person One out of town.  This is akin to his plea hearing, where the defendant minimized his involvement in the obstruction and shifted blame to others, claiming that "[a]t no time was [his] intent to have anyone not be available for questioning," but rather that sending

witnesses out of town was Harris's idea.   Plea Transcript at 36-38.

Such statements are inconsistent with the "clear[] demonstration [of] acceptance of responsibility" required for credit under the guidelines.   *See* § 3E1.1; *United States v. Panice*, 598 F.3d 426, 435-36 (7th Cir. 2010) ("[m]erely pleading guilty does not entitle a defendant to an acceptance of responsibility reduction," denying adjustment where the defendant "barely admitted the facts necessary to predicate a finding of guilt in this case") (citation omitted).   As previously noted, courts repeatedly deny credit where the defendant denies culpability, barely admits to the offense, and blames his crimes on others.   Defendant offers no contrary authority.

## OTHER SECTION 3553(a) FACTORS

Because it ignores the full panoply of his campaign finance and obstruction offenses – and cannot explain away his false denial of participation in the $10,000 payment – the defendant's sentencing request is not appropriate or reasonable.   Although the Court can and should consider the legitimate arguments the defendant makes – about his professional career, personal life, age, and physical ailments – these considerations do not merit probation.   At best, they call for period of incarceration below the guidelines range, precisely as the government advocates.

Specifically, the defendant argues that the Court should consider his age and physical health.   Deft. Memo at 24-25, 27-28.   The government does not disagree; it has considered these factors in requesting a sentence substantially below the guidelines range and below what the § 3553(a) factors would call for regarding a series of offenses as outrageous as those defendant committed here.   *See*, *e.g.*, U.S.S.G. § 5H1.1 (age may be relevant); § 5H1.4 (physical condition may be relevant).   However, the government does dispute the defendant's suggestion that ███

███████████████████████████████████████████████████████████████

███████████████   Defendant's argument on this relies entirely upon   ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████   ██████████████████████████████

█████████████████████████████████████████████████████

## **CONCLUSION**

For the reasons described above, the government respectfully urges that the Court sentence the defendant to 12 months of incarceration (below the low end of the applicable guidelines range), followed by three years of Supervised Release.   Such a sentence is appropriate and reasonable in light of the guidelines and all the factors to be considered at sentencing under 18 U.S.C. § 3553(a). *See also* Plea Agreement at ¶ 13 (defendant agreed that sentence within range of 10 to 16 months was "reasonable" under § 3553(a) factors).

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney
D.C. Bar No. 415-793

_____/s/_____
Michael K. Atkinson
Jonathan P. Hooks
Assistant United States Attorneys
555 4th Street, NW
Washington, DC 20530

DATED:   April 18, 2016